# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL KENNETH PORTER,<br><br>Plaintiff,<br><br>vs.<br><br>NURSE HOWARD, et al.,<br><br>Defendant. | CASE NO. 10cv1817 JLS (PCL)<br><br>REPORT AND RECOMMENDATION GRANTING DEFENDANTS' MOTION TO DISMISS<br>(Doc. 76)<br><br>ORDER DENYING PLAINTIFF'S MOTION TO CONTINUE; DENYING PLAINTIFF'S MOTION FOR POLYGRAPH EXAMINATION; AND DENYING PLAINTIFF'S MOTION FOR EXTENSION OF TIME<br>(Docs. 93, 95, & 101) |

On August 30, 2011, Plaintiff Samuel K. Porter, a state prisoner proceeding *pro se* and *in forma pauperis*, filed a Second Amended Complaint ("SAC") against Defendants Howard, Hernandez, Ault, and the California Department of Corrections ("C.D.C.R.") for violations of his civil rights under Title 42, United States Code § 1983. (Doc. 73.) Porter seeks money damages and an injunction requiring Defendants to disclose the findings of a Crime Incident Report created in response to Porter's allegations and requiring Defendants to administer a polygraph test to Plaintiff. (Doc. 73, at 15.) Defendants have filed a Motion to Dismiss Plaintiff's FAC for failure to exhaust his administrative remedies and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (Doc. 76, at 1-2.) Plaintiff filed an untimely Response in Opposition to Defendants' Motion to

Dismiss. (Doc. 104.) No reply has been filed. Upon review of the SAC, Defendants' motion, and Plaintiff's Opposition, this Court recommends that Defendants' motion be GRANTED.

## I.  PROCEDURAL BACKGROUND

Porter filed his original Complaint on August 30, 2010, and a First Amended Complaint ("FAC") on November 23, 2010. (Docs. 1 & 13.) Defendants moved to dismiss and strike the FAC. (Doc. 27.) This Court issued a Report and Recommendation for Order granting Defendants' Motion to Dismiss and denying Defendants' Motion to Strike, (doc. 56) which was adopted on July 29, 2011, (doc. 64). Porter filed a Second Amended Complaint on August 20, 2011. (Doc. 73.) Defendants filed a Motion to Dismiss the Second Amended Complaint, (doc. 76) on September 22, 2011, and Porter filed an untimely Opposition to Defendants' Motion to Dismiss on December 22, 2011, (doc. 104).

## II.  FACTUAL ALLEGATIONS

### *A.  The First and Second Amended Complaints*

The SAC alleges two counts against Defendants. In the first count, Porter alleges Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment, his Due Process rights and his "right to file grievance (retaliatory)." In Count Two, Porter alleges Defendants violated his First Amendment right to "address grievance," his Eighth Amendment rights, and his Due Process rights. (Doc. 73, at 10.)

Porter's FAC and SAC are substantially the same. However, in the SAC, Porter adds a new count alleging violations of his First Amendment "right to address grievance." (Doc. 73, at 10.) In addition, the form provided for prisoner § 1983 complaints provides a place for plaintiffs to indicate whether they have "sought and exhausted all forms of informal or formal relief from the proper administrative officials" regarding the allegations in the complaint. (Doc. 73, at 14.) In Porter's FAC, he answered yes and stated that he made a crime incident report number FDP-09-07-0349 and inmate appeal case number 09-09193/CAL-09-01376. (Doc. 13, at 8.) In Porter's SAC, he also answered yes but stated that when he tried to report the rape, the staff at Centinela ignored him or told him that "there would be no record and [he] better keep his mouth quiet." (Doc. 73, at 14.) He states that "prison employees prevented [him]" from filing a 602 and he now wishes to take a "pro-active

approach" by taking a polygraph examination to demonstrate the veracity of his allegations. (Doc. 73, at 14.)

### B. *The Second Amended Complaint*

In his SAC, Porter alleges that he was raped by other inmates while incarcerated at Centinela State Prison between 2007 and 2008 and that the rape was arranged by prison staff in retaliation for his having informed on a warden at another prison. (Doc. 73, at 2-10.) Porter also alleges that prison staff at all levels have engaged in a conspiracy to keep him quiet and that they "operate under a code of silence." (Doc. 73, at 9.)

In support of these allegations, Porter claims that Defendant Howard, a prison nurse, recorded the rape on her cell phone and that Defendant Hernandez told him, "the next time someone gives you a knife you better use it" referring to a shank supplied to Porter by his cellmate prior to the rape. (Doc. 73, at 3-6.) According to the SAC, Porter tried to report the rape to Defendant Hernandez, but Hernandez ignored it and took him to the nurse instead. (Doc. 73, at 6.) Porter claims Defendant Howard laughed at him and told him prison staff were behind the rape. (Doc. 73, at 6.) At some point, Porter went to the nurse's window and told Defendant Howard and another nurse that he would make them take a polygraph, to which Howard responded, "we're going to keep you 'till the statute of limitations runs out," prompting Porter to spit in the face of a second nurse, telling them, "you punk ass mothafuckas I['m] going to get the F.B.I. and polygraph all you mothafuckas!" (Doc. 73, at 6-7.) Porter alleges that he then wrote to the F.B.I. in San Diego, the United States District Court, Southern District of California, the Department of Justice, and the Inspector General, but received no responses. (Doc. 73, at 7.) He claims that an I.S.U. officer told him his letters "ain't going nowhere and no one's going to believe you" and, that after such "tacit and open acknowledgment that they were going to prevent [him] from filing anything [he] stopped." (Doc. 73, at 7.)

Porter claims that the conspiracy against him was widespread and included prison staff, administration, and inmates. (Doc. 73, at 6-9.) The purported conspiracy was intended to keep Porter "quiet" and staff implemented it by "sporadically" raping him and going through his possessions to see what he had written. (Doc. 73, at 6-9.) Specifically, he alleges that approximately one year after the initial rape, he was transferred to Corcoran and that, immediately after arrival, he was raped again

and then periodically thereafter. (Doc. 73, at 9.) He alleges this initial rape following the transfer was filmed on a cell phone by Captain Jennings and that staff threatened him and preventing him from reporting the rape until he told staff psychologist J. Ault in 2009. (Doc. 73, at 9-14.) Porter claims that Ault wore an earpiece during their interview and that he was able to hear Defendant Howard's voice on the other end of the earpiece. (Doc. 73, at 12.) He goes on to allege that Ault was "reluctant" during the interview and told him, "they don't like what you're doing" and that she didn't want any part of it. (Doc. 73, at 12.)

Porter also alleges that after being moved to Corcoran he " was tired of sporadically being raped, I pissed in my cellie's toothpaste he got real sick . . . from then on I didn't sleep til he went to school . . these acts coupled with the fact that I saw 4 I.S.U. start relaying information they all turned away from me and said 'we cant talk to you.'" (Doc. 73, at 9.) In addition, the SAC states "I am going to draft a preliminary injunction requesting . . . an x-ray to show I have had a tapeworm I have expelled it 3 times and these people are sabotaging my test (stool results)[1]." (Doc. 73, at 8.)

This Court takes judicial notice of case number 10cv1811, filed in the Eastern District of California, in which Porter makes nearly identical factual allegations against different Defendants. This Court also takes notice of case number 9cv1566, which contains allegations that are substantially similar to those in the FAC and SAC and that was dismissed as frivolous pursuant to 28 U.S.C. § 1915A(b)(1). We also take notice of case number 11cv2021, also dismissed as frivolous, in which Porter alleged Eighth Amendment violations related to a tapeworm and sought an injunction requiring the defendants in that case to submit to polygraph testing.

**III.   DISCUSSION**

Defendants moved to dismiss Porter's complaint on the grounds that he failed to exhaust administrative remedies and for failure to state a claim upon which relief can be granted under Federal

---

[1] The court is not bound to entertain claims whose factual contentions are clearly baseless, such as claims describing fantastic or delusional scenarios. See Neitzke v. Williams, 490 U.S. 319, 327-28 (1989) (statute governing *in forma pauperis* proceedings accords judges not only the authority to dismiss claims based on indisputably meritless legal theories, but also the power to pierce the veil of a complaint's factual allegations and dismiss those which are fantastical or delusional); Franklin v. Murphy, 745 F.2d 1221, 1227 (9th Cir. 1984) ("District courts have the authority to dismiss complaints founded on wholly fanciful factual allegations for lack of subject matter jurisdiction." (internal citations and quotations omitted). While this Court is not presently making a finding that the SAC's factual allegations are wholly fanciful, we do admit that we are wary of many of Plaintiff's allegations.

1  Rule of Civil Procedure 12(b)(6). (Doc. 76, at 2.) Defendants base their 12(b)(6) motion on grounds
2  that Defendant C.D.C.R. is immune under the Eleventh Amendment and Plaintiff does not state a
3  cause of action against Defendant Ault. (Doc. 76, at 2.) Plaintiff bases his Opposition on Defendants
4  "failure to recognize that [Department Operations Manual] Section Article 44 Prison Rape Elimination
5  Policy . . . as the only available remedy" and on Defendant's "procrastination" indicating that they
6  intended to discourage reporting of sexual abuse, and on Defendant C.D.C.R.'s failure to administer
7  a polygraph to Plaintiff and Defendants. (Doc. 104, at 1.)

8  For the following reasons, this Court agrees with Defendants and recommends that Porter's
9  SAC be dismissed.

10  **A.     Exhaustion**

11  Defendants moved to dismiss Porter's SAC on grounds that he failed to exhaust administrative
12  remedies. Construing Porter's SAC and Opposition liberally, it appears he argues in the alternative
13  that he either (1) exhausted his administrative remedies by sending letters detailing his allegations to
14  other agencies outside the C.D.C.R.; or (2) is excused from the exhaustion requirement because he
15  was prevented from exhausting his administrative remedies by prison staff.

16  A careful review of the record indicates that Porter filed many grievances while incarcerated,
17  but that only one grievance mentioned rape. That sole grievance cannot suffice to exhaust his
18  administrative remedies because (1) Porter filed it long after the 15 day period provided in California
19  prison regulations to file a grievance following an adverse event; and (2) the grievance did not give
20  prison officials fair notice of the problem and an opportunity to correct the problem because it focused
21  on Porter's desire for a single cell. Griffin v. Arpaio, 557 F.3d 1117, 1120 (9th Cir. 2009) (To exhaust
22  administrative remedies a prison grievance must alert the prison to the "nature of the wrong for which
23  redress is sought.") Moreover, to the extent that Porter claims that his letters to law enforcement
24  agencies or to the courts served to exhaust his administrative remedies, they do not. Finally, because
25  Porter made extensive use of the inmate grievance system for other matters and because Porter alleges
26  threatening and spitting at prison staff, his allegations that he failed to properly exhaust because prison
27  officials caused him duress, intimidated or threatened him, or otherwise prevented him from filing
28  grievances are simply incredible.

### *1.     Standard of Review*

Under 42 U.S.C. § 1983, a plaintiff has a cause of action against anyone who under color of state law deprives the plaintiff of a constitutional right. Cooper v. Garcia, 55 F.Supp 2d 1090, 1096 (S.D. Cal. 1999). However, the Prison Litigation Reform Act ("PRLA") amended 42 U.S.C. § 1997e(a) and requires a prisoner to exhaust all available administrative remedies prior to bringing suit under 42 U.S.C. § 1983 over prison conditions. Exhaustion is mandatory and a prisoner must properly exhaust available administrative remedies by complying with the procedures set out by the prison system. Woodford v. Ngo, 548 U.S. 81, 91-94 (2006). In other words, when a prisoner attempts to exhaust via alternate methods, such as writing letters, the prisoner will not meet the exhaustion requirement. See Panaro v. Ciry of North Las Vegas, 432 F.3d 949, 950 (9th Cir. 2005) (participation in internal affairs investigation in lieu of using the prison's internal grievance procedure is not sufficient to satisfy the exhaustion requirement of the PLRA);and see Townes v. Paul, 407 F. Supp.2d 1210, 1218 (S.D. Cal. 2005) (filing of a "citizen's complaint" in lieu of the prison's administrative grievance process was not sufficient to exhaust under PLRA).

Nonexhaustion under § 1997(e) is an affirmative defense that defendants have the burden of raising and proving. Jones v. Block, 549 U.S. ___ (2007); Wyatt v. Terhune, 315 F.3d 1108, 1119 (9th Cir. 2003). A defendant must show that some relief remains available whether at unexhausted levels of the grievance process or through awaiting results of the relief already granted as a result of that process. Brown v. Valoff, 422 F.3d 926, 936-37 (9th Cir. 2005). "Relevant evidence" sufficient to demonstrate a prisoner's failure to exhaust "include[s] statutes, regulations, and other official directives that explain the scope of the administrative review process; documentary or testimonial evidence from prison officials who administer the review process; and information provided to the prisoner concerning the operation of the grievance procedure . . . ." Id.

In deciding a motion to dismiss for failure to exhaust, the court may look beyond the pleadings and resolve disputed issues of fact. Wyatt,315 F.3d at 1119-20; see Ritza v. Int'l Longshoremen's & Warehousemen's Union, 837 F.2d 365, 369 (9th Cir. 1988) (permitting the consideration of affidavits submitted by the parties on a motion to dismiss for failure to exhaust non-judicial remedies). If the court finds that the prisoner has failed to exhaust non-judicial remedies, the proper remedy is dismissal of the claim without prejudice. Wyatt,315 F.3d at 1120. Generally, a court should grant *pro se*

1 litigants leave to amend, however, the court may exercise its discretion and deny leave to amend when
2 it is clear that the plaintiff cannot allege any set of facts that would entitle him or her to relief. See
3 Zenith Radio Corp. V. Hazeltine Research, Inc., 401 U.S. 321, 330 (1971); Karim-Panahi v. Los
4 Angeles Police Dept., 839 F.2d 621, 625 (9th Cir. 1988).

### 2. *Administrative Remedies Available to California Prisoners*

A California state prisoner must exhaust the administrative remedies available through the California Department of Corrections and Rehabilitation ("CDCR"). A prisoner may appeal any decision, action, condition, or policy of the CDCR which the prisoner can demonstrate as having an adverse effect upon his or her welfare. Cal. Code Regs. tit.15, §§ 3084.1(a) & 3084.2. In order to exhaust administrative remedies, California Prison Regulations require a prisoner to first file an informal grievance by filling out an Inmate/Parolee Appeal Form 602 and seek relief through discussion with the appropriate staff member. Id. § 3084.1(a). If the prisoner is not satisfied with the resolution of the informal complaint, then there are three further levels of formal review. The first two levels of review are conducted by the Appeals Coordinator and the Warden, respectively, at the institution in which the prisoner is incarcerated. Cal. Code Regs. tit.15 § 3084.5(b-d). The third (or "Director's") level of review is made to the Director of the California Department of Corrections, and a prisoner is required to proceed through each of these levels of review in order to exhaust. Id. § 3084.1(b); and see Barry v. Ratelle, 985 F.Supp 1235 (S.D. Cal. 1997) (finding exhaustion where prisoner at least attempted to appeal through each level, though he never received a response from the second and third levels).

### 3. *Porter's Inmate Grievances*

Defendants have submitted declarations from the Appeals Coordinators at each of the prisons in which Porter was incarcerated. (Docs. 27-3 through 27-13.) On July 25, 2009, Porter submitted an inmate/parolee appeal form CDC 602, which was stamped received on July 30, 2009, and given a log number 0901376. (Doc. 27-7, at 13.) This was the only grievance among many grievances submitted by Porter that mentions rape. (Docs. 27-3 through 27-13.) On that 602 form, Porter described his problem as follows:

> On July 22, 2009 I again gave information to C.D.C.R. of a staff orchestrated rape because of retaliation of warden's embezzling money. I told a psychologist I believe her name is J. Ault although I like Ms. Ault and think her very professional, I disagree

>with her rejection of giving me single cell status. I have been complaining both medically and through the mental health department nightmares & paranoia because of the traumatic situations (rapes) I offered a written narrative due to the lengthy subject but Ms. Ault said no thanks. I want to sleep a good night sleep and feel safe. It should be duly noted that this decisions by Mrs. Ault . . .[2]

(Doc. 27-2, at 20.)

Porter requested the following action in response to his problem: "to be given single cell status and if denied a written explanation as to why. I also now request investigation and a polygraph examination." (Doc. 27-7, at 20.) He also attached regulations prescribing the methods by which inmates should be assigned to housing. (Doc. 27-7, at 33-34.)

The administrative record indicates that Porter was interviewed by Correctional Counselor II, M. Whitman on August 28, 2009, and that his appeal was partially granted. (Doc. 27-7, at 35.) Whitman's written response to the grievance acknowledges Porter's willingness to submit to polygraph testing to "prove the veracity of [his] allegations" and indicates that on July 31, 2009, Crime Incident Report number CAL-FDP-09-07-0349 was completed to address Porter's rape allegations, but that the report did not contain any evidence to substantiate Porter's claims. (Doc. 27-7, at 35.) In addition, Whitman wrote that a review of Porter's Central File did not reveal any history of sexual predatory abuse of or by Porter with the exception of the allegation Porter made to Defendant Ault. (Doc. 27-7, at 35.) The response then explains the criteria for single cell housing and the reasons that Porter did not qualify for a single cell. (Doc. 27-7, at 35.)

Dissatisfied with the response, Porter resubmitted his grievance, requesting second level review. (Doc. 27-7, at 33.) Porter explained the reason he was dissatisfied with the first level response as follows: "I am dissatisfied no single cell status my interviews were equivalent to testimony per [Department Operations Manual] I can get this status with information I also submitted declarations! See further explanations and attached documents." (Doc. 27-7, at 33.) Porter attached a lengthy explanation, telling corrections officers "first and foremost you are in the state of California and you are to abide by its laws!" (Doc. 27-7, at 37.) Porter went on to quote various regulations and to detail the ways in which his claims of rape were not adequately investigated. (Doc. 27-7, at 37-38.)

---

[2] Porter's writing fills the space provided for inmates to describe the problem on the 602 form and ends with an arrow, however there are no additional pages in the record that appear to be associated with the quoted text.

In particular, Porter described various reasons that a polygraph should be administered. (Doc. 27-7, at 37-38.) He also complained that he had not been given a "chrono" documenting information gathered by classification staff Miller and Whitman relevant to his eligibility for single cell status. (Doc. 27-7, at 37-38.) Porter stated that he had stayed quiet because he had been "scared and paranoid due to the level of personnel involved" but that he had been in contact with the F.B.I. and the federal courts and that "it would be strategic to grant me single cell status as it may stop the process of this 602." (Doc. 27-7, at 37-38.)

Porter also attached copies of a letter addressed to the courts and the California Department of Justice and a declaration. (Doc. 27-7, at 39-45.) In the letter, he described some personal altercations that he had experienced with his child's mother prior to his incarceration, and mentioned snitching on the warden. (Doc. 27-7, at 39-45.) He wrote "it is obvious that the warden's wife and my son's mother got together" and described a conspiracy with Officers Lowe and Jennings to drug him with coffee and have inmates rape him at Corcoran. (Doc. 27-7, at 40.) In the declaration, Porter wrote, "I have been the victim of staff orchestrated inmate rapes as a result of my grievances and a[n] incident that happen on the street with my baby's mama. I request a lawyer and a federal investigation." (Doc. 27-7, at 43.) The declaration describes threats made by a warden's wife as a result of Porter's snitching to the authorities. Porter volunteered to take a polygraph to prove his allegations were true; described some trouble he had participated in as a gang member; described being housed with rival gang members at Corcoran; being raped by the husband of Porter's "baby's mama;" and being told by one of the "orchestrators" that he had H.I.V., but that his test would continue to be negative unless he told a particular story. (Doc. 27-7, at 43-45.)

Together, the letter and declaration consume 7 pages of difficult to comprehend handwriting. Porter mentions Defendant Hernandez only twice between the two documents. The first mention alleges that "Hernandez showed he knew about the incident before and after the fact because the next day he told me 'the next time somebody gives you something you better use it.'" (Doc. 27-7, at 41.) The second mention of Defendant Hernandez is in the declaration and states "I was told by Capt. Hernandez 'somebody's going to have a talk with you.' This is prison jargon for someone's going to fight with you." (Doc. 27-7, at 43.) Defendant Howard is also only mentioned twice in the two documents. Porter wrote that Nurse Howard worked on "A" yard, and photographed incidents with

1 her cell phone. (Doc. 27-7, at 44-45.)

2 Nowhere in either the letter or the declaration, did Porter request that Defendants or staff be investigated for their alleged participation in a rape conspiracy. Rather, Porter repeatedly requested investigation under the prison regulations governing determination of inmate housing classification. Each of his requests for additional investigation is immediately followed by, and closely tied to, a request for single cell status. (Doc. 27-7, at 31-52.) For example, when Porter complained of not receiving a "chrono" documenting information gathered relevant to his classification, he specifically cited regulations pertaining to housing classifications. (Doc. 27-7, at 38.) According to Porter, the regulations require the classification committee to review an inmate's central file as well as other available information and require the committee to make their decision the basis of inmate interviews, which are to be documented in a "chrono." (Doc. 27-7, at 38.)

Porter's grievance was denied at the second level. The memorandum documenting the denial defined the issue by stating " it is the appellant's position that he should be allowed single cell status since he claims he has been the victim of numerous sexual assaults. The appellant requests single cell status." (Doc. 27-7, at 46.) The denial cited prison regulations governing housing assignments and stated that Porter had not provided any proof that the alleged sexual assaults took place and that there was no evidence in Porter's central file to support the allegations. (Doc. 27-7, at 46.) It also noted, "there is not even any evidence that the appellant ever reported [the] sexual assaults until he mentioned it to [m]ental [h]ealth staff during an interview in July 2009." (Doc. 27-7, at 37-38.)

Porter then requested a Director's Level review, stating that he was dissatisfied with the second level response. Porter complained that prison officials had inadequately investigated his rape claims by not administering a polygraph examination to prove the truth of his rape conspiracy allegations. Porter also claimed the F.B.I. wrote to Porter stating that the prison had been informed of Porter's letters to "Sacramento." (Doc. 27-7, at 32, 48.) Porter detailed the steps he believed the Department of Corrections was required to take in order to investigate his allegations in compliance with prison regulations. (Doc. 27-7, at 48.) Porter wrote "I request that I be single cell status. To give you a taste of the veracity of my allegations I pose this challenge that when the first incident happened at Centinela . . . [corrections officers] told [him] that [you] can write who [you] want ain't nothing going to happen." (Doc. 27-7, at 48.) He stated that he had submitted several memoranda with titles such

1  as "Clarification of Single Cell Status Requirements" and "Double Cell Housing Policy."  (Doc. 27,
2  at 48.)  He wrote, "you persistently want to keep me double celled, and I am willing to prove the
3  veracity of my allegation toward staff in detail through polygraph yet you still won't give me single
4  cell status?"  (Doc. 27-7, at 48-49.)

5  On May 21, 2010, Porter's appeal was again denied at the Director's Level. (Doc. 27-7, at 51.)
6  The letter denying his appeal defines Porters argument as follows: "It is the appellant's position that
7  he disagrees with the psychologist's decision to not give him single cell status. The appellant claims
8  this is in retaliation because on July 22, 2009, he gave information that 'CDCR of staff orchestrated
9  rapes because of retaliation of warden's embezzling money.'"  (Doc. 27-7, at 51.)  The Director's
10 decision found that Porter had failed to support his request for single cell status with sufficient
11 documentation, and that it had been appropriately determined that Porter met the criteria for double
12 cell housing.  (Doc. 27-7, at 51.)   The decision also stated that Porter had added new issues and
13 requests to his appeal, and that those issues were not being addressed as they served to extend the
14 appeal beyond the initial problem and the initially requested action..  (Doc. 27-7, at 51.)

15 Porter did not file any additional appeals regarding the alleged rape conspiracy or other  new
16 issues he raised during the appeal process.

17 *3.     Application of PLRA to Porter's Inmate Grievance*

18 In his Opposition, Porter does not argue that he properly exhausted his administrative remedies
19 by using the inmate grievance process provided by the California Prison system.  Rather, Porter
20 contends that he should not be required to do so because the "Prison Rape Elimination Policy" was
21 the only available remedy and constitutes a separate administrative review process. (Doc. 104, at 1-5.)
22 Porter claims that Defendants failed to follow C.D.C.R. policies pertaining to prison rape. (Doc. 104,
23 at 1, 3.)  He claims that those policies outline certain procedures for investigation of rape allegations
24 and that those procedures entitle him to obtain polygraph investigations of himself or of Defendants
25 in order to prove that his allegations that he was afraid of Defendants are true.  (Doc. 104, at 7.)

26 Porter also argues that Defendants failure to take a polygraph examination demonstrates that
27 his allegations are true - essentially he argues that if they were not engaged in a conspiracy, there
28 would be no reason not to take the examination.  (Doc. 104, at 6-10.)  His Opposition focuses on his
allegations that Defendants have not given him any copies of video or audio recordings made during

- 11 -                                                                                                                    10CV1817

their interviews following his allegations of rape. Porter argues that Defendants' failure to produce these materials shows that they operate under a "code of silence" and "are trying to cover-up." (Doc. 104, at10-20.)

Exhaustion as required by the PLRA is not only mandatory but a prison must also *properly* exhaust available administrative remedies. Woodford v. Ngo, 548 U.S. 81, 91-94 (2006) (emphasis added)  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Id. The above described grievance was filed at Calipatria on July 25, 2009, but the rape alleged in the SAC occurred in 2007 at Centinela. Because prisoners are required to file a grievance within 15 days of the offending event, Porter's sole grievance related to being raped was untimely. Cal. Code Regs., tit. 15 § 3084.6(c); (Docs. 73, at 2-3; 13, at 12.) Porter's arguments that his correspondence with the courts, the F.B.I., the California Department of Justice, and other agencies served to notify the prison of the alleged rape, thereby excusing his failure to file a timely inmate appeal regarding the issue are unavailing. Such correspondence was not in compliance with the procedures set out by the prison system and did not constitute proper exhaustion.

Similarly, even if the grievance had been timely, it would not have been sufficient to exhaust administrative remedies for the claims in Porter's SAC. In California, prison regulations are silent as to the factual specificity required in an inmate grievance, therefore a grievance suffices if it alerts prison officials to the nature of the wrong for which redress is sought. Griffin v. Arpaio, 557 F.3d 1117, 1120 (9th Cir. 2009). Porter first mentioned the alleged rape conspiracy in materials he attached to his request for second level review of his grievance - materials that were acknowledged in the denial at the Director's Level as raising "new issues.". In those materials, Porter wrote "it is obvious the warden's wife and my son's mother got together . . . I have been the victim of staff orchestrated rapes because of grievances and an incident on the street with my baby's momma." This was not Porter's first mention that he had been raped, but it was the first shift in his grievance from focusing solely on single cell status to discussing a broader "conspiracy." Even so, Porter's grievance did not seek redress for the rapes. At all levels of the grievance process, Porter focused on his desire for single cell status and to have either himself or prison staff polygraph tested in furtherance of getting single cell status. Porter referred to the alleged rape as the source of his nightmares and paranoia, which caused him to seek single cell status. He wrote that he was "dissatisfied no single cell status"

1 and that granting him single cell status might "stop the process of this 602." (Doc. 27-7, at 33, 37-38.)

2 His grievance also indicated that he wanted additional investigation of his rape allegations through polygraph testing - a subject he also raises in his SAC. However there is no constitutional right to an adequate investigation. Mitchell v. McNeil, 487 F.3d 374, 378 (6th Cir. 2007). The administrative record indicates that Porter previously acknowledged that prison staff interviewed him following his report of the rape. (Doc. 27-7, at 38.) Moreover, Prison staff investigated the matter, prepared a crime incident report, and provided Porter with a copy of the incident report. See Dooley v. Reiss, 736 F.2d 1392, 1394-95 (9th Cir. 1984) (plaintiff failed to state a claim under § 1983 where Plaintiff's rights were not actually violated or were already vindicated).

10 Prison staff determined that Porter was not eligible to be single celled and this determination is not the subject of the present complaint, nor is it the proper subject matter for a civil rights complaint under § 1983. Prison officials rightly continued to focus on housing as the primary subject of his grievance and Porter, who is very familiar with the grievance process could have filed an additional 602 raising his new issues. See Sapp v. Kimbrell, 623 F.3d 813, 823-24 (9th Cir. 2010) (inmate grievance was properly screened out when it contained mixed messages). Defendants have submitted relevant evidence, in the form of affidavits, describing Porter's entire grievance record showing that Porter failed to exhaust his administrative remedies with respect to the issues in the present complaint. Therefore, Porter has the burden to come forward with evidence showing that he did exhaust his administrative remedies, but he failed to produce any evidence whatsoever showing that he did so.

### 4. *Availability of Administrative Remedies*

22 Finally, to the extent that Porter alleges that he was unable to exhaust his administrative remedies because prison officials intimidated him, told him his mail was going nowhere, told him nothing would happen if he filed a grievance, "placed him in duress," or otherwise prevented him from doing so, those allegations are simply not credible. The PLRA does not require a prisoner to exhaust administrative remedies that are "effectively unavailable." 42 U.S.C. § 1997c(a); Nunez v. Duncan, 591 F.3d. 1217, 1226 (9th Cir. 2010) (a prisoner was excused from the exhaustion requirement where he was prevented from exhausting by the prison itself). Similarly, there are certain exceptions to timely filing of grievances, such as where an inmate lacks access to the necessary forms because of

1  hospitalization or inmate lockdowns. Marella v. Terhune, 568 F.3d 1024, 1027 (9th Cir. 2009). If a
2  plaintiff claims he was prevented from exhausting by threats from prison staff, he must show "(1) the
3  threat actually did deter the plaintiff inmate from . . . pursuing a particular part of the process; and (2)
4  the threat is one that would deter a reasonable inmate of ordinary firmness and fortitude from . . .
5  pursuing the part of the grievance process that the inmate failed to exhaust. Turner v. Burnside, 541
6  F.3d 1077, 1084-85 (11th Cir. 2008). In addition, where a prisoner lacks a "reasonable good faith
7  belief" that administrative remedies are unavailable, exhaustion will not generally be excused. See
8  Sapp, 623 F.3d at 822; Nunez v. Duncan, 591 F.3d 1217, 1225-26 (9th Cir. 2010).

9        To support his claims that staff prevented him from filing a grievance, Porter states that
10  corrections officers, ignored him, told him they would not make a record of his complaints, and that
11  his "mail was going nowhere". (Doc. 73, at 14.)  In addition, he conclusively states that prison
12  officials prevented him from filing a grievance and that the "Defendants and their constituents
13  threatened and prevented [him] from reporting the incident." (Doc. 73, at 9.)

14        Porter was incarcerated at Calipatria State Prison from March 10, 2009 through the time he
15  filed the present complaint on August 30, 2010. (Doc. 27-7, at 3.) While at Calipatria, Porter filed
16  12 inmate appeals. (Doc. 27-7, at 3.) Porter filed six inmate appeals while incarcerated at Centinela
17  Sate Prison - where the alleged events occurred - from June 13, 2007, through June 25, 2008. (Doc.
18  27-4, at 2-3.) Porter was also housed at Ironwood State Prison, where he filed twelve appeals and
19  Corcoran State Prison, where he filed two appeals. (Docs. 27-10, at 3-6 & 27-3, at 2.) Of the many
20  inmate appeals filed by Porter, the grievance described above is the only one in which he mentions
21  being raped. (Doc. 27-7, at 3-6.)

22        Porter's voluminous grievances, letters to other law enforcement agencies, acts of spitting on
23  prison staff and threatening them with litigation and investigation all indicate that Porter was not in
24  the least bit intimidated by corrections officers. On the contrary, in his own pleadings and other
25  filings, Porter paints the picture of a man who was aggressive and belligerent towards corrections
26  staff. In addition, counter to his assertion that prison staff made no record when he attempted to report
27  the rape, his rape allegations are documented in the record in the form of Porter's untimely grievance
28  related to the rape and in the Crime Incident Report related to the rape. (Doc. 27-7.) In addition,
counter to Porter's allegations that prison officials intercepted his mail to other agencies, he stated that

he did receive return mail from the F.B.I.; that he would be able to obtain records from the F.B.I. documenting his correspondence to them; and that the F.B.I. is required to notify the prison of his complaints. (Docs. 27-7, at 49, & 104, at 6.)

Nonetheless, Porter insists that administrative remedies were "unavailable" to him. (Doc. 104, at 5.) He argues that none of the rules apply to him because the Prison Rape Elimination Act ("PREA") was the only available remedy. Porter focuses on CDCR rules requiring that all rape allegations be investigated and documented in writing and complains that when he tried to get a copy of the written documentation related to his allegations, he only got "an abridged version" because prison officials wanted to keep the full version "hidden" from him. (Doc. 104, at 6.) Porter goes on to admit however, that he "finally got a copy." (Doc. 104, at 6.) His Opposition continues for a lengthy, mostly illegible thirty pages full of internal contradictions all designed to convince this Court that there is a conspiracy which would be revealed if only Porter could force everyone to take polygraph tests. (Doc. 104.)

Even assuming a conspiracy to keep Porter quiet actually exists, the PLRA requires a prisoner to exhaust administrative remedies exactly as set out by the prison system before bringing suit in federal court for *any* reason. See Woodford, 548 U.S. at 113 (Stevens, J. Joined by Souter, J., and Ginsberg, J. dissenting) (acknowledging that the PLRA, as interpreted by the majority, would create a procedural bar even in tragic cases where prisoner's Eighth Amendment rights are infringed such as in cases of prison rape facilitated by guards). California prison regulations clearly set out a grievance process, which does not include the PREA. Moreover, the 30 grievances filed by Porter during his incarceration make abundantly clear that the grievance system was available to Porter.

For all of the above reasons, Porter's SAC makes clear that there is no set of facts that he can allege, which will overcome the lack of exhaustion. Accordingly, his SAC should be dismissed without prejudice and leave to amend should be denied.

**B.     Failure to State a Claim Under Federal Rule of Civil Procedure 12(b)(6)**

*1.     Standard of Review*

A motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6) tests the legal sufficiency of the claims in the complaint. Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal is proper where the complaint does not have factual

allegations sufficient to establish plausible as opposed to merely possible or speculative entitlement to relief. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). This Court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them, and must construe the complaint in the light most favorable to plaintiff. Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508 n.1 (2002); Papasan v. Allain, 478 U.S. 265, 283 (1986). However, legal conclusions couched as factual allegations need not be accepted as true. Twombly, 550 U.S. at 555. Detailed factual allegations are not required to survive a motion to dismiss for failure to state a claim, but a complaint must contain more than labels, conclusions, and a formulaic recitation of the elements of a cause of action. Id.

Where a plaintiff appears *pro se*, the court must construe the pleadings liberally and afford the plaintiff any benefit of the doubt. Karim-Panahi v. Los Angeles Police Dep't., 839 F.2d 621, 623 (9th Cir. 1988). While vague and conclusory allegations will not withstand a motion to dismiss, the court must supply a statement of the complaint's deficiencies before the complaint may be dismissed. Id. at 623-24. However, as with litigants represented by counsel, where amendment of a *pro se* litigant's complaint would be futile, denial of leave to amend is appropriate. Id.

### 2. Defendant J. Ault[3]

Under 42 U.S.C. § 1983, a plaintiff has a cause of action against anyone who under color of state law deprives the plaintiff of a constitutional right. Cooper v. Garcia, 55 F.Supp 2d 1090, 1096 (S.D. Cal. 1999). Therefore, to make out a cause of action under § 1983, a plaintiff must plead that (1) the defendant acted under color of state law; and (2) deprived plaintiff of rights secured by the Constitution or federal statutes. Gibson v. United States, 781 F.2d 1334, 1338 (9th Cir. 1986), cert. Denied, 479 U.S. 1054 (1987). A plaintiff must also demonstrate that each defendant personally participated in the deprivation of his rights. Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002). To survive a motion to dismiss, a complaint must state enough facts, taken as true, to state a claim for relief that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, ___ (2009). "Where the well pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

---

[3] It is not clear from the record that Defendant Ault has been served with a summons or copy of the SAC. However, Defendants have not disputed valid service and have included arguments specific to Ault in their Motion to Dismiss.

complaint has alleged- but it has not shown that the pleader is entitled to relief." Id. (internal quotations and citations omitted). Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. Id. (internal quotations and citations omitted).

Porter alleged that Ault acted under color of law because she was a prison psychologist. (Doc. 73, at 2.) But the only allegations regarding Ault's conduct in the SAC are that, after an interview with Porter, she stated "they don't like what you're doing," and "I don't want nothing to do with this." (Doc. 73, at 12.) Porter does not link these utterances with any specific allegations that Ault was a member of any conspiracy, but rather, states that Ault "was reluctant" during interviews because, he believed, she feared staff "retaliation." (Doc. 73, at 12.) Taking Porter's allegations against Ault as true, Porter's interpretation does not amount to more than pure speculation that she participated in any conspiracy. Moreover, the alleged rape occurred two years earlier than Porter's contact with Ault and at a different prison. As stated in Ashcroft, this Court does not reject Porter's allegations "on the ground that they are unrealistic or nonsensical" but because the alleged statements are as consistent with Ault's non-participation in any alleged conspiracy as with her participation. As a mental health professional, Ault should have wide latitude to discuss various matters or express opinions as to inmate behavior. Without any context or other allegations to specifically link the alleged statements to a conspiracy against Porter, the allegations against her are conceivable, but not plausible. As such, the allegations against Ault are insufficient to state a claim for relief and any claims against her should be dismissed.

### 3. *Defendant C.D.C.R.*

The Eleventh Amendment prohibits federal courts from hearing suits brought against an unconsenting state. Brooks v. Sulphur Springs Valley Elec. Co-op., 951 F.2d 1050, 1053 (9th Cir. 1991) (citing Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100 (1984)); S. Pac. Transp. Co. v. City of Los Angeles, 922 F.2d 498, 508 (9th Cir. 1990). The Eleventh Amendment's jurisdictional bar covers suits naming state agencies and departments as defendants, and applies whether the relief sought is legal or equitable in nature. Id. State departments of corrections are state agencies, immune from suit under §1983. Taylor v. List, 880 F.2d 1040, 1044 (9th Cir. 1989). The C.D.C.R. is immune from suit, and therefore, Porter has not stated a claim against the C.D.C.R. and

his claims against it must be dismissed under F.R.C.P. 12(b)(6).

### 4. First Amendment Claims

Porter's SAC alleges that his First Amendment rights were violated when Defendants threatened him by telling him to keep quiet, that his mail was going nowhere, that no one would believe him, and when he was raped again after his transfer to Corcoran. (Docs. 73, at 6-12; & 104, at 20-21.) He alleges that the Defendants "prevented him from reporting the incident until the day [he] told the psychologist Dr. J. Ault," and the Defendants "used the custom of the code of silence to back each other's wrongdoing so they don't inform on each other if too many employees are involved." (Doc. 73, at 9-10) Porter states "no employee of the C.D.C.R. came up and told me we're not going to retaliate against you now it's ok to report. In fact, Dr. J. Ault was the only one to listen." (Doc. 73, at 12.) Porter also complains that the prison blocked communication with the warden because anything he wrote that might jeopardize an employee's employment never made it to the warden. (Doc. 73, at 13.) Porter also relies on "insidious statements which [he] was able to hear" but does not identify the content of the statements nor who made the statements. (Doc. 73, at 12.) In Count One of the SAC alleging Eighth Amendment violations, Porter alleged that Defendant Hernandez told Porter, "we're going to teach you to keep your mouth shut" and that Defendant Howard told Porter, "I don't like your ass and we going to show you shut your mouth and leave people alone." (Doc. 73, at 4.)

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 568 (9th Cir. 2005) (citing Resnick v. Hayes, 213 F.3d 443, 449 (9th Cir.2000); Barnett v. Centoni, 31 F.3d 813, 815–16 (9th Cir. 1994)). In determining whether an inmate's ability to exercise his First Amendment rights was chilled the inquiry is whether the conduct would chill or silence a person of ordinary firmness from future First Amendment Activities. Rhodes, 408 F.3d at 569.

The right to file an inmate grievance falls under protected conduct. See Id. at 567 (citing Bruce v. Ylst, 351 F.3d 1283, 1288 (9th Cir. 2003). Generally, on a motion to dismiss, a court must

accept as true the factual allegations in the complaint. However, courts are not bound to accept as true a legal conclusion couched as a factual allegation. Twombly, 550 U.S. at 544. Bare allegations of arbitrary retaliation are not enough, by themselves, to avoid dismissal. Rizzo v. Dawson, 778 F.2d 527, 532 n.4 (9th Cir. 1985). Dismissal may be warranted when there is no factual support for the allegations or the factual support is contradicted by facts that the court can notice or that are apparent in the record. Id.

Porter's statements that at Centinela and Corcoran, he tried to report the "incidents" but "they gave a negative response or just walked away [and] put Plaintiff in a state of fear it would happen again" scarcely amount to more than legal conclusions and fail to identify conduct by Defendants. (Doc. 73, at 12.) No staff from Corcoran has been named as a Defendant. Similarly, "negative responses," walking away, and similar statements do not give rise to more than the possibility of misconduct. See Ashcroft, 556 U.S. at ___. As such they are too vague to state a claim. Similarly, Porter's references to "insidious statements" and "code of silence" are also too vague to state a claim. He does not say who threatened him or how the threats prevented him from exercising his First Amendment rights. Moreover, Porter's arguments that he was prevented from reporting the rape are contradicted by facts in the record that are noticeable by this Court, namely Porter's extensive use of the grievance process for a variety of matters, as well as his statements that he threatened Defendants and spit at a prison nurse. Rizzo, 778 F.2d at 532. Porter's allegations that Defendants Howard and Hernandez promised to teach Porter to keep his mouth shut appear to relate either to the rape itself, or to another "incident that happened on the street." They too, are vague and insufficient to state a claim. See Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987) (mere verbal harassment or abuse does not violate the Constitution). Finally, Porter's blanket statement that Defendants prevented the filing of a grievance amounts to a legal conclusion and is also insufficient to state a claim for First Amendment retaliation.

Porter's First Amendment Claims should be dismissed. If leave to amend is granted, Porter should be instructed to adhere to Federal Rule of Civil Procedure 8, requiring a "short and plain statement of the claim showing the pleader is entitled to the relief." Fed. R.Civ. Proc. 8. He must demonstrate, via clear and concise statements, when and how each Defendant retaliated by preventing him from exercising his First Amendment rights.

**IV.`   OTHER MOTIONS**

Also pending on the docket are Porter's Motion to Continue, Motion for Polygraph Examination**,** and Motion for Extension of Time to File a Response.  (Docs. 93, 95. & 101.)

Because Plaintiff's Motion to Continue, (doc. 93) appears to be a motion to compel certain discovery, it is DENIED as premature.

For the reasons stated in our previous Order Denying Porter's Motion for Order to Polygraph, (doc. 58), Porter's Motion for Polygraph Examination, (doc. 95) is DENIED.

Plaintiff's Motion for Extension of Time to File Response, (doc. 101), is DENIED as moot.

**V.   CONCLUSION**

For the reasons set forth above, the Court recommends granting Defendants' Motion to Dismiss.

This Report and Recommendation is submitted to United States District Judge Sammartino, pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c) of the United States District Court for the Southern District of California.  Any written objections to this Report and Recommendation must be filed with the Court and a copy served on all parties on or before **March 19, 2012**.  The document should be captioned "Objections to Report and Recommendation."  Any reply to the objections shall be served and filed on or before **April 9, 2012**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of this Court's order.  Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATE: February 27, 2012

Peter C. Lewis
U.S. Magistrate Judge
United States District Court